# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**David Lee Myers,**

    **Petitioner,**

**v.**                                             Case No. 3:04-cv-174
                                                         Chief Judge Algenon L. Marbley

**Margaret Bagley, Warden,**            Magistrate Judge Kimberly A. Jolson

    **Respondent.**

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254. This matter is before the Court on Petitioner's Motion for Leave to Conduct Discovery (ECF No. 130), Respondent's Memorandum in Opposition (ECF No. 131), and Petitioner's Reply (ECF No. 132). Also before the Court is Petitioner's Motion for Oral Argument (ECF No. 134), which Respondent does not oppose (ECF No. 135). Petitioner's Motion for Leave to Conduct Discovery (ECF No. 130) is **GRANTED**, and Petitioner's Motion for Oral Argument (ECF No. 134) is **DENIED** as moot. The Court further **ORDERS** that the parties, within forty-five (45) days of the date of this Opinion and Order, file a Joint Status Report as described in Part III.C. below.

## I. BACKGROUND

This case arises out of Petitioner's conviction for the capital murder of Amanda Maher in the early morning hours of August 4, 1988 in Xenia, Ohio, and Petitioner's resulting death sentence. Petitioner was seen with Maher walking in the direction of railroad tracks where Maher was later found clinging to life, a few hours after Petitioner had spent time with Maher and her boyfriend, Glenn Smith, at two Xenia bars. Petitioner has always maintained his

innocence, and the evidence against him consisted of a single pubic hair recovered from Maher's pubic region, other circumstantial evidence, and inculpatory testimony by two jailhouse informants. And during trial, Petitioner also pointed to a viable alternate suspect named Gregg Grimes.

Petitioner seeks to have physical evidence collected in this case subjected to DNA testing that was not available at the time of Petitioner's trial. Petitioner asserts that DNA testing could establish his actual, factual innocence under any one of three theories, to wit: (1) establishing the presence on multiple pieces of evidence of a redundant unknown DNA profile, as well as the absence on multiple pieces of evidence of Petitioner's DNA profile; (2) actual identification of the perpetrator; and/or (3) obtaining a confession from the perpetrator upon being confronted with irrefutable DNA evidence. Petitioner argues that the DNA testing he seeks could establish his actual, factual innocence sufficient to excuse any procedural default levied by Respondent against one or more of Petitioner's claims. For the reasons that follow, the Court is satisfied that Petitioner has established good cause for DNA testing.

## II. STANDARD OF REVIEW

The discovery processes contained in the Federal Rules of Civil Procedure do not automatically apply in habeas corpus actions. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In *Harris v. Nelson*, the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings. 394 U.S. 286, 295 (1969). As a result of the holding in *Harris*, Congress promulgated the Rules Governing Section 2254 Cases In United States District Courts in 1976.

Specifically, Rule 6(a) provides:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is . . . entitled to relief. . . .'" *Bracy*, 520 U.S. at 908–909 (quoting *Harris*, 394 U.S. at 300); *see also Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). In keeping with the well-settled principle that habeas petitioners are not entitled to go on fishing expeditions in search of damaging evidence, this "good cause" standard requires the petitioner to at least attempt to identify what he expects to uncover through his discovery requests. *See Williams*, 380 F.3d at 976.

## III. DISCUSSION

### A. *Dretke v. Haley* and the "Rule of Avoidance"

As a preliminary matter, Respondent includes in her argument as to why Petitioner cannot show good cause an assertion that any discovery supporting the actual innocence exception would be premature, due to the "rule of avoidance." (ECF No. 131, at PageID 20501–02). Respondent notes that in *Dretke v. Haley*, 541 U.S. 386, 393–94 (2004), the Supreme Court held that "'a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all non-defaulted claims for comparable relief and other grounds for cause to excuse the procedural default.'" (ECF No. 131, at PageID 20502 (quoting *Dretke*, 541 U.S. at 393–94)). Tying this "rule of avoidance" back to Petitioner's burden to show

3

good cause, Respondent argues that until this Court addresses Petitioner's non-defaulted claims, Petitioner "cannot show that the DNA testing he seeks will likely or necessarily lead to habeas corpus relief based on a procedurally defaulted claim." (ECF No. 131, at PageID 20502).

Petitioner offers several arguments in response. First, Petitioner asserts that "Habeas Rule 6 provides that discovery may be authorized upon a showing of 'good cause,' and includes no timing requirement for requesting discovery." (ECF No. 132, at PageID 20506). According to Petitioner, the Advisory Committee Notes to Rule 6, as well as the Court's decision in *Harris*, 394 U.S. at 300, state that discovery may be provided at any time in a habeas proceeding. (ECF No. 132, at PageID 20506).

As for Respondent's reliance on *Dretke*'s "rule of avoidance," Petitioner argues:

*Dretke* does not hold, however, that this Court cannot grant discovery before deciding all other grounds for cause to excuse any claimed procedural default. Myers is not asking the Court to grant relief on his allegedly-defaulted [sic] claims, he is merely asking for leave to conduct discovery in the form of DNA testing. *Dretke*'s holding is not yet applicable. Once the appropriate and complete factual record is before the Court, then the Court will have the ability to decide the merits of Myers' constitutional claims, beginning first with his non-defaulted claims, should the Court so decide.

(*Id*. at PageID 20507). Petitioner also distinguishes *Dretke* on its facts, noting that the State in *Dretke* conceded that there was a viable and significant claim of ineffective assistance of counsel that would afford the inmate the relief he sought (resentencing), and that "[t]he Warden has made no similar concessions in this case." (*Id*.). Petitioner contends that Respondent's proposed course of action—foregoing consideration of Petitioner's discovery request until after the Court addresses all of Petitioner's non-defaulted claims for comparable relief—"would cause more delay and logistical headaches for the Court rather than permitting the resolution of Myers' limited request for DNA testing now." (*Id*. at PageID 20508). Petitioner also notes that "to the

4

extent the Warden has raised concerns about the time and expense of DNA testing, Myers does not seek funding from the Court." (*Id*. at PageID 20513). "Before deciding a habeas petition involving an irreversible penalty," Petitioner states in conclusion, "this Court should consider all relevant facts bearing on Myers' constitutional claims." (*Id*.). The Court agrees.

The question presented (but not decided) in *Dretke* was whether the "actual innocence" exception to procedural default should be applied to noncapital sentencing procedures. *Dretke*, 541 U.S. at 388. The Supreme Court did not reach that issue, however, concluding that the district court had erred in failing to first consider alternate grounds for relief that might have obviated any need to reach the "actual innocence" question. *Id*. at 388–89. Specifically, the Court held that "[a] federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default." *Id*. at 393–94. The Court agrees with Petitioner that any application of *Dretke*'s "rule of avoidance" to the instant request would be premature. This Court is not being asked at this time to find that Petitioner has satisfied the "actual innocence" gateway to permit review of meritorious defaulted claims. All that has been requested at this stage of the proceedings is an opportunity to develop facts through habeas corpus discovery. That request is subject only to a showing of good cause.

Additional factors militate against applying *Dretke* to the instant request for discovery. *Dretke* was not a capital case; Petitioner's is, and he is arguing that the DNA testing he requests will show that he is factually, actually innocent of the crime for which he is sentenced to die. Further, in *Dretke*, the state conceded the existence of a viable ineffective assistance of counsel claim that would provide the relief (resentencing) the petitioner sought. No such concessions

5

have been made here. And there is another distinction. In *Dretke*, the Supreme Court expressed concerns about whether consideration of the "actual innocence" exception would unnecessarily prolong the case. 541 U.S. at 395. Here, not only would granting discovery at this stage not unduly prolong these proceedings, but the Court agrees with Petitioner that waiting until all procedural default issues and all nondefaulted claims for comparable relief are resolved before considering Petitioner's request for discovery (DNA testing) would result in significant delay—delay that could be avoided by granting discovery at this stage of these proceedings. Nor would the DNA testing requested be costly, for Petitioner has made clear he is not requesting funding from this Court for that testing. (ECF No. 132, at PageID 20513).

In sum, the Court is not persuaded that *Dretke*'s "rule of avoidance" prevents Petitioner from demonstrating good cause for the discovery he seeks.

**B. Good Cause**

Determining whether Petitioner has shown good cause to conduct the discovery he seeks begins with identifying the essential elements of Petitioner's gateway "actual innocence" claim. *Bracy*, 520 U.S. at 904. A federal habeas court may reach the merits of an otherwise defaulted claim to prevent a fundamental miscarriage of justice if the court finds a compelling demonstration that Petitioner is actually innocent. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Williams*, 380 F.3d at 966. In *House v. Bell*, the Supreme Court explained:

> Out of respect for the finality of state-court judgments federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted. In certain exceptional circumstances involving a compelling claim of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition.

547 U.S. 518, 522 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 319–22 (1995)).

6

A "gateway" claim of actual innocence permitting review of an otherwise defaulted claim requires prisoners to establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. A federal court considering a gateway claim of actual innocence should not limit its consideration to only the new evidence presented; rather, it must consider the fully developed record, consisting of old evidence and new evidence in total, in making a "probabilistic determination of what reasonable, properly instructed jurors would do." *Id*. at 329. That includes making credibility determinations. *House*, 547 U.S. at 539; *Schlup*, 513 U.S. at 330. Finally, a gateway claim of actual innocence requires a showing of factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). Thus, the essential elements of a gateway actual innocence claim appear to be: (1) new evidence; (2) of factual innocence not "legal" innocence; (3) making it more likely than not that <u>no</u> reasonable juror would have found guilt beyond reasonable doubt. The question before the Court is whether specific allegations show reason to believe that Petitioner may, if the facts are more fully developed through the discovery Petitioner requests, be able to demonstrate a gateway "actual innocence" claim.

With respect to the essential elements of a gateway "actual innocence" claim, *first*, the Court is satisfied that results of the DNA testing Petitioner seeks constitute "new" evidence. As Petitioner demonstrates (ECF No. 130, at PageID 20420-23), DNA testing has evolved considerably since Petitioner's 1996 trial sufficient to conclude that the DNA testing Petitioner is proposing was not available at the time of his trial. *Second*, Petitioner is not alleging that the discovery he seeks would establish a legal insufficiency as to one or more of the crimes for

7

which he was convicted; rather, Petitioner is unequivocally arguing that he is factually innocent of the crimes for which he was convicted and sentenced to death. All that remains to be determined, is whether Petitioner may, if the facts are more fully developed through the DNA testing he seeks, show that it is more likely than not that no reasonable juror, armed with the results that Petitioner believe DNA testing will produce, would have found guilt beyond a reasonable doubt. The Court is persuaded that he may.

Consider the state's case against Petitioner. It was largely circumstantial but was nonetheless damning in one critical respect—scientific evidence around which questions now swirl.

As noted earlier, Petitioner has always maintained his innocence. He made no inculpatory statements, save for testimony by two jailhouse informants about incriminating admissions that Petitioner allegedly made while awaiting trial—testimony that is always to be viewed with caution. *See, e.g., Brooks v. Tennessee*, 626 F.3d 878, 893 (6th Cir. 2010) (citing *Banks v. Dretke*, 540 U.S. 668, 701 (2004)). The prosecution's case against Petitioner rested considerably on the fact that Petitioner was the last person seen with the victim before she was found, beaten and stabbed and clinging to life. Further, law enforcement investigated, and Petitioner subsequently presented evidence of, a viable alternative suspect, Gregg Grimes, as well as an alleged accomplice of Grimes, Terry Rogers.

As for the irregularity, Petitioner was initially arrested and charged in 1988, shortly after the victim died.[1] (ECF No. 91-1, at PageID 15456–57). But those charges were dropped on February 1, 1991; Petitioner was re-indicted two years later, on February 4, 1993. (*Id.* at PageID

15462). In the interim between those two aggravated murder indictments, Petitioner was incarcerated stemming from his guilty plea to eleven counts of forgery. (*Id*. at PageID 15460-61). On January 31, 1992, Petitioner filed a federal civil lawsuit against Greene County and Xenia officials stemming from their investigation of Petitioner for Maher's murder. That lawsuit was set for trial on April 5, 1993, only to be dismissed a month before that trial was to begin. (*Id*. at PageID 15461-62).

Given the circumstantial nature of the state's case against Petitioner, the scientific evidence was critical. And that evidence is not without questions.

In spite of the violent nature of the crime—the victim's shirt was pushed up to her neck and she was naked from the waist down; she was strangled and beaten about the face, had three rocks shoved into her vagina, and had a railroad spike driven entirely into her right temple—the only physical evidence that connected Petitioner to the victim was a "well-traveled" pubic hair recovered from victim's pubic region. Three experts testified at trial, albeit with varying degrees of certainty, that the pubic hair in question was consistent with Petitioner, but not with the victim herself; the victim's boyfriend Glenn Smith; or alternate suspects Gregg Grimes and Terry Rogers. BCI forensic scientist Dr. Michelle Yezzo testified that the foreign pubic hair had had some similarities and some differences with Petitioner, (ECF No. 90-7, at PageID 13782), and was inconsistent with the victim and the victim's boyfriend, Glenn Smith (*Id.*). Dr. Yezzo also testified that the foreign pubic hair was Caucasian, and that Gregg Grimes and Terry Rogers were African-American. (*Id.*, at Page ID 13780–81.) During cross-examination, defense counsel questioned Dr. Yezzo about certain discrepancies between her conclusions and those of

---

[1] The victim died a few hours after being found while she was being life-flighted from Greene

other state experts. (*Id.* at PageID 13822–26.) And during the defense's case-in-chief, one of Petitioner's original defense attorneys, Jeffrey Moore, testified that Dr. Yezzo had suggested to him that she was told by the prosecutor not to prepare another report because prosecutors feared it could exclude Petitioner as the donor of the foreign hair. (ECF No. 90-14, at PageID 15383–85). Criminalist Larry DeHus testified that the foreign pubic hair was "identical" to Petitioner. (ECF No. 90-8, at PageID 14046). He also testified that the hair was "clearly" Caucasian. (*Id.*, at PageID 14076). Dr. Richard Bisbing, of McCrone Associates, Inc. in Illinois, testified with "absolute certainty" that the victim, the victim's boyfriend Glenn Smith, and alternate suspects Gregg Grimes and Terry Rogers could be excluded as the source of the foreign pubic hair; and that that hair was similar in all respects to Petitioner's samples (ECF No. 90-10, at PageID 14293–95). But the microscopic hair comparison that those experts undertook is now regarded as questionable science at best. (ECF No. 130, at PageID 20404, fn. 6).

The primitive DNA testing that was available at the time of Petitioner's trial also linked Petitioner to the foreign pubic hair recovered from the victim. But other testimony presented at trial, as well as experts with whom Petitioner's counsel have more recently consulted, raise numerous and significant concerns about that conclusion—such as the possibility of an innocent transfer of DNA by first responders, the possibility that the hair was switched with the sample hairs that Petitioner provided, the possibility of cross-contamination; and the indisputable reality that the DNA testing that exists now is more accurate and reliable than the DNA testing that was available at the time of Petitioner's trial. Dr. Edward Blake testified during the state's case-in-chief (and Dr. Phillip Hartman confirmed during the state's rebuttal case) that the donor of the

---

County hospital to another hospital in nearby Dayton.

single foreign pubic hair found on the victim's pubic region had the DQ alpha genotype of 1.3, 2; that two percent of the North American Caucasian population, or 1 in 50 people, would have that genotype; and that the victim, alternate suspects Gregg Grimes and Terry Rogers, and the victim's boyfriend Glenn Smith all had a different DQ alpha genotype. (ECF No. 90-9, at PageID 14127–28, 14160–62, 14170, 14197–98; ECF No. 91-1, at PageID 15519–22). But Dr. Blake, defense expert Dr. John Gerdes, and Dr. Hartman all testified about the infancy of DNA testing, or other flaws in DNA testing in the forensic setting, during the period of 1988-1990. (ECF Nos. 90-9, at PageID 14110–12, 14124–25; ECF No. 90-13, at PageID 15005–126; ECF No. 91-1, at PageID 15503, 15530).

It also bears noting that in 1995, while preparing for trial, two defense investigators found another foreign hair on the victim's shirt, which was being stored with other evidentiary items in the county evidence room (ECF No. 90-10, at PageID 14329–32). But Dr. Bisbing testified that that hair was "not similar in all respects" to Petitioner (ECF No. 90-10, at PageID 14317). Dr. Yezzo was not even asked to analyze that hair (ECF No. 90-7, at PageID 13816–17). That hair was not submitted for DNA testing as the hair linked to Petitioner was (ECF No. 90-10, at PageID 14317–18). And the prosecution insinuated that that hair was planted by the defense team (ECF No. 90-10, at PageID 14331–35). This suggests a distinct effort to illuminate evidence that incriminated Petitioner while discounting evidence that did not.

As the Court noted in its overview, Petitioner asserts that DNA testing could establish his actual, factual innocence under any one of three theories, to wit: (1) establishing the presence on multiple pieces of evidence of a redundant unknown DNA profile, as well as the absence on multiple pieces of evidence of Petitioner's DNA profile; (2) actual identification of the

11

perpetrator; and/or (3) obtaining a confession from the perpetrator upon being confronted with irrefutable DNA evidence. To that point, Petitioner also argues that "[t]he absence of Myers' DNA on the evidence from the crime scene, in conjunction with the presence of DNA of an unidentified DNA profile on these items, would place sufficient doubt on the accuracy of the verdict as to require a new trial." Although several medical and scientific experts testified as to why, in spite of the nature of the assault and the victim's injuries, the perpetrator(s) might have gotten little or no blood on him or them (ECF No. 90-10, at PageID 14383–84; ECF No. 90-14, at PageID 15287–337), it seems probable from the crime scene, from evidentiary items found at the crime scene, and from the victim's injuries that the perpetrator would have left DNA evidence. And Petitioner consents to providing samples of bodily fluids, with the understanding that those samples could be used to investigate other crimes. (ECF No. 130, at PageID 20425).

The foregoing amounts to more than "speculative theories" and "baseless allegations" as alleged by Respondent. (ECF No. 131, at PageID 20503). Petitioner's discovery request does not amount to an open-ended fishing expedition in the hopeful search for favorable evidence that he does not know to or have reason to be believe exists. Rather, his request is specific, targeted, and well-founded as to a component of the state's case against him that was critical and is not without questions—questions that defense counsel were merely able to scratch the surface of at trial and that modern DNA testing could more completely answer now. In view of the importance of the scientific evidence to the state's case against Petitioner, as well as questions surrounding that evidence that modern science could resolve, the Court is satisfied that Petitioner may, if the facts are more fully developed through the DNA testing he seeks, show that it is more likely than not that no reasonable juror, armed with the results that Petitioner believe DNA

12

testing will produce, would have found guilt beyond a reasonable doubt.

### C. Logistics

Petitioner lists twenty-two evidentiary items "that contain DNA evidence that will exclude Myers as the perpetrator of the crime." (ECF No. 130, at PageID 20424–25). But according to Petitioner, he has had limited success in determining the whereabouts of this evidence despite his diligent efforts. (*Id*. at PageID 20425). To that end, Petitioner requests a host of orders compelling the state to properly preserve all of the identified evidence, to disclose documentation, to conduct a search for physical evidence with the parties' agents present, and to release that evidence to a laboratory of Petitioner's choosing. (*Id*. at PageID 20434). The Court is neither inclined, nor in the best position to, micromanage the logistics of this process. That being so, the Court will give the parties forty-five (45) days to file a joint status report: (1) disclosing the location of any and all physical evidence in Petitioner's case, as well as all documentation concerning that evidence; (2) certifying that the physical evidence identified is being properly preserved; (3) outlining a procedure for searching for any other physical evidence from Petitioner's case that may exist but has not been identified or inventoried; and (4) disclosing one or more proposed accredited DNA laboratories of Petitioner's choosing to conduct the testing, as well as a proposed procedure and timeline for providing the evidentiary items to Petitioner's laboratory of choice.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's Motion for Leave to Conduct Discovery (ECF No. 130) is **GRANTED**, and Petitioner's Motion for Oral Argument (ECF No. 134) is **DENIED** as moot. The Court further **ORDERS** that the parties, within forty-five (45) days of the date of this

Opinion and Order, file a Joint Status Report as described in Part III.C. above.

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. § 636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5. The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This Order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.3.

IT IS SO ORDERED.

Date: February 11, 2020 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE